UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

DAMARIS E. SOLANO,

    Plaintiff,

  v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA,

    Defendant.

NO. CIV. S-04-0357 FCD/PAN

MEMORANDUM AND ORDER

----oo0oo----

  This matter is before the court on defendant Regents of the University of California's ("University") motion for summary judgment or, in the alternative, summary adjudication of plaintiff Damaris Solano's ("Solano" or "plaintiff") claims[1] for: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Fair Employment and

---

[1] Plaintiff's complaint provides indistinct claims for relief and defendant's motion is based on its interpretation of plaintiff's purported legal bases for her action. The court will proceed on the understanding that these are the only claims that plaintiff is asserting as she has not objected to defendant's classification of her complaint.

1

Housing Act ("FEHA"); (2) gender discrimination in violation of Title VII and FEHA; (3) retaliation in violation of Title VII and FEHA; (4) failure to prevent discrimination in violation of FEHA; and (5) wrongful termination in violation of public policy. Plaintiff opposes the motion.[2]

**BACKGROUND**

Solano, an employee of the University of California ("University") since 1983, was hired at the Davis campus in April 1994 as an Accountant III Assistant Manager in the Accounting and Financial Services, Student Aid Department. (Def.'s Reply to Pl.'s Response to Def.'s Sep. Stmt. of Und. Facts ("RUF") ¶¶ 1, 2.) As part of her job in Accounting and Financial Services, Solano was knowledgeable about governmental laws and regulations pertaining to the University's accounting responsibilities, and University policies and procedures, including its travel policy.[3] (Id.; Depo. of Damaris Solano, Exh. A at 22:10-23:20.) In March 2002, Solano was appointed to a six-month position as Accountant III Interim Manager, in which capacity Solano was responsible for supervising four Accountant I supervisors and reviewing the travel vouchers of her subordinates before submitting them for

---

[2] Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

[3] Plaintiff's cited evidence that she did not have responsibility for approving travel vouchers until she was appointed Interim Manager does not create a dispute of fact as to whether she was familiar with the University's travel policy. It is undisputed that plaintiff approved "hundreds" of travel vouchers in her prior position of travel services manager at UC Berkeley. (Dep. of Damaris Solano, Exh. A at 22:10-23:20.) It is proper to infer that by virtue of this work experience plaintiff gained familiarity with the University's travel policy.

2

1  payment.  (RUF ¶ 3.)  Shortly before her appointment as Interim
2  Manager in February 2002, Solano was asked by her supervisor to
3  attend a work-related conference, the SCT Summit, in Anaheim
4  California.  (RUF ¶ 4.)  Solano decided to drive to Anaheim, and
5  stayed in a room with two double beds at the Disneyland Hotel.
6  (RUF ¶¶ 5,6.)  Members of Solano's family apparently accompanied
7  her on the trip.

8      After the SCT Summit, Solano prepared a travel voucher
9  requesting payment of the following expenses: (1) $50
10 meal/incidental expenses on March 23 and 24 (the first two days
11 of the conference), (2) $37 meal/incidental expenses on March 25
12 to 27 (the remaining three days of the conference), (3) $247.25
13 lodging expenses per day, (4) $387.90 car rental expenses, and
14 (5) $8.00 parking fees on March 23.  In the remarks section of
15 the travel voucher, Solano, noted that lunch was provided on
16 March 25 to 27 at the conference, the hotel rate was the same for
17 single as it was for double occupancy, and the car rental fee was
18 the same for five days as it was for a week.  (RUF ¶ 10.)

19     Maria Potratz ("Potratz"), who had responsibility for
20 reviewing Solano's travel voucher, became suspicious because
21 portions of Solano's corporate credit card statement were
22 redacted and Solano's hotel costs exceeded those incurred by
23 others attending the conference.  Potratz expressed her concerns
24 to Solano's superior, Assistant Vice Chancellor James Allred
25 ("Allred"), who directed Potratz to conduct an investigation.

26     During the investigation, Potratz found that Solano claimed
27 $244.88 more than she was entitled on her travel voucher for the
28 SCT Summit.  Specifically, she found that Solano only should have

3

charged the University for the cost of the hotel room at the single occupancy rate of $189.00 per night, rather than $209.00 per night for double occupancy; the cost of comparable airfare instead of a minivan rental at $387.90 per week; $21.00 food allowance for March 25 through 27 versus the claimed $37.50 per day.[4] (RUF ¶¶ 13-15.)

In addition, Potratz determined that Solano used her corporate credit card for personal expenses during the SCT Summit in Anaheim. Potratz then reviewed Solano's credit card statements from October 2001 through April 2002 and discovered that Solano had made personal purchases at Marine World, Dress Barn, Chevron, Clark Pest Control, and Walmart. (RUF ¶ 17.) While Solano did not seek reimbursement from the University for any of these personal expenses, such personal use of the corporate credit card violated University policy. (RUF ¶ 19.)

In addition, Potratz concluded that Solano made the following untruthful statements during the investigation: (1) Solano claimed she had purchased two adult tickets and two child tickets to Disneyland, but the receipt bearing her signature indicated she purchased three adult tickets and one child ticket; (2) Solano indicated she was contesting the $170 charge for the tickets because they were for use on the same day at two different parks, but Potratz confirmed with Disneyland that the tickets were not date-specific and could have been used anytime;

---

[4] The parties describe at length an ongoing factual dispute regarding whether Solano overstated the cost of a chicken dinner she ordered from room service at the Disneyland Hotel. Solano listed the price as $43.00, but the University submits evidence that the most expensive chicken dinner entree on the Disneyland Hotel room service menu is $16.50.

4

1  (3) Solano told Potratz in February that she had made her air
2  travel arrangements, but later said she required medication when
3  she traveled by air and admitted she never planned to fly; (4)
4  Solano insisted she ordered an in-room chicken dinner that cost
5  $43.00, however, when Potratz obtained the menu from the hotel,
6  the most expensive chicken dinner was $16.99; (5) despite
7  Solano's statement she intended to request payment of the cost of
8  comparable airfare, the original travel voucher sought
9  reimbursement for the full cost of the vehicle rental and did not
10 include any note stating otherwise, and (6) according to Solano,
11 she was not aware a $18.00 late return charge was included in the
12 cost of the vehicle rental, yet  Alamo confirmed that the late
13 charge was added to and included in the rental agreement receipt
14 when the vehicle was returned.  (RUF ¶ 21.)

15    The University's Internal Audit Services were notified and
16 affirmed Potratz's conclusions that Solano claiming reimbursement
17 of inappropriate expenditures and had consistently and
18 inappropriately used the University corporate card.  (RUF ¶ 22.)

19    Based on the conclusions reached by Potratz and Internal
20 Audit Services, Allred issued a letter of intent to dismiss on
21 August 2, 2002 and placed Solano on paid administrative leave.
22 (RUF ¶ 22.)  On August 12, 2002, Solano responded to Allred's
23 letter of intent to dismiss, disputing Allred's findings and
24 alleging that Allred discriminated against her.  (RUF ¶ 23.)  As
25 evidence of the discrimination, Solano stated that Allred
26 demanded she give up her participation in campus groups such as
27 the Staff Affirmative Action and Diversity Advisory Committee
28 ("SAADAC") and the Hispanic Staff Association ("HSA").  Allred

5

1 disputes this and claims that Solano actually voluntarily ceased
2 participation on those committees in June 2000.  (RUF ¶ 31.)
3     Another University employee, Bob Murta, was appointed to
4 review Allred's decision to dismiss Solano and concluded that,
5 while Solano knew or should have known that her conduct was
6 unsatisfactory, in lieu of dismissal, Solano should be demoted to
7 work as an Accountant I in Accounting and Financial Services.
8 (RUF ¶ 35.)
9     Solano filed a timely grievance on March 27, 2003, alleging
10 violation of, <u>inter alia</u>, University anti-discrimination and
11 progressive discipline policies.  The University issued a Step 1
12 response on April 28, 2003 concluding that no University policies
13 were violated.  (RUF ¶¶ 35, 36.)  Solano timely appealed on May
14 7, 2003.  The resolution officer assigned to the appeal concluded
15 that the grievance was unsubstantiated and affirmed.  Solano did
16 not appeal the decision to Step 3.  (RUF ¶ 37.)
17     Solano subsequently filed a complaint with the United States
18 District Court for the Northern District of California.  The case
19 was transferred to the Eastern District on February 19, 2003.
20 Plaintiff filed an amended complaint on February 23, 2003.
21 Defendant filed the instant motion for summary judgment on May
22 31, 2005.

**STANDARD**

24     Pursuant to Rule 56 of the Federal Rules of Civil Procedure,
25 summary judgment is appropriate when "there is no genuine issue
26 as to any material fact and . . . the moving party is entitled to
27 judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under this
28 standard, an issue is "genuine" if there is sufficient evidence

6

1  for a reasonable jury to find for the nonmoving party and a fact
2  is "material" when it may affect the outcome of the case under
3  the substantive law that provides the claim or defense.  <u>Anderson</u>
4  <u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).  The
5  determination is made based solely upon admissible evidence.  <u>Orr</u>
6  <u>v. Bank of America</u>, 285 F.3d 764, 773 (9th Cir. 2002).
7  Furthermore, the court must view inferences made from the
8  underlying facts in the light most favorable to the nonmoving
9  party.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970).
10      The moving party has the initial burden to demonstrate the
11 absence of a genuine issue of material fact.  <u>Celotex Corp. v.</u>
12 <u>Catrett</u>, 477 U.S. 317, 323 (1986).  If the moving party is
13 without the ultimate burden of persuasion at trial, it may either
14 produce evidence negating an essential element of the opposing
15 party's claim, or demonstrate that the nonmoving party does not
16 have enough evidence to carry its ultimate burden of persuasion
17 at trial.  <u>Nissan Fire & Marine Insurance Co. v. Fritz Companies,</u>
18 <u>Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party
19 meets this initial requirement, the burden then shifts to the
20 opposing party to go beyond the pleadings and set forth specific
21 facts that establish a genuine issue of material fact remains for
22 trial.  <u>Matsushita Elec. Indust. Co. v. Zenith Radio Corp.</u>, 475
23 U.S. 574, 585-87 (1986).  Summary judgment should not be granted
24 where "there are any genuine factual issues that properly can be
25 resolved only by a finder of fact because they may reasonably be
26 resolved in favor of either party."  <u>Anderson</u>, 477 U.S. at 250.
27      Following this same rubric, a court may grant summary
28 adjudication on part of a claim or defense, based on the

7

1  standards applicable to a motion for summary judgment. See Fed.
2  R. Civ. P. 56(a),(b); State of California v. Campbell, 138 F.3d
3  772, 780 (9th Cir. 1998).

## ANALYSIS

Plaintiff's complaint alleges that defendant violated provisions of Title VII and California's FEHA, which both prohibit unlawful discrimination. Because FEHA is modeled on Title VII, California courts often rely upon federal interpretations of Title VII when analyzing analogous provisions of FEHA. Bradley v. Harcourt, Brace and Co., 104 F.3d 267, 269-70 (1996). Accordingly, the court analyzes plaintiff's federal and state claims under Title VII, expounding any relevant discrepancies where necessary.

### I. Race Discrimination Claim Under Title VII and FEHA

To establish a prima facie case of race discrimination, plaintiff must prove: (1) she belongs to a protected class; (2) she was performing according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated individuals who are not in her protected class more favorably.[5] Defendant concedes that plaintiff established the first three factors; however, defendant disputes that plaintiff can establish that similarly

---

[5] Defendant contends that many of the discriminatory acts alleged by plaintiff are barred by the statute of limitations. However, plaintiff clarifies that the only basis of her race discrimination claims is the discipline imposed on her on February 28, 2003, which claim clearly is timely. Because the plaintiff has limited the scope of her claim to that event, the court need not address the timeliness of the other acts cited by defendant. (See Def.'s Mem. Supp. Summ. J. at 21-22; Pl.'s Mem. Opp'n Summ J. at 7.)

8

situated individuals not in her protected class were treated more favorably.  Contrary to defendant's contention, plaintiff has established a prima facie claim of disparate treatment between herself and others similarly situated.  Specifically, Solano produced evidence that no other employees have been subject to comparably severe discipline for similar misconduct.  She identified non-Latina employees in the Accounting and Financial Services department who submitted fraudulent travel vouchers to the University and were not subject to any discipline.[6]

While defendant concedes that "exceptions to policy" were made for other employees who submitted fraudulent travel vouchers, it argues that Solano has produced no evidence that they also "were uncooperative and untruthful in responding to questions about their [travel vouchers] nor that they repeatedly used their corporate card for personal purchases as she did." (Def.'s Mem. Supp. Summ. J. ("Def.'s Mem.") at 23.)  Construing the facts in the light most favorable to Solano, the court finds that she has made a prima facie case of disparate treatment. First, all of the misconduct here – Solano's and that of the other employees – was relatively minor: inadvertently overstating the amount of reimbursement on a single travel voucher and using a corporate credit card for personal expenses which were *not* billed to the University.  Solano has submitted evidence that her misconduct was accidental rather than deliberate, which version

---

[6] Plaintiff specifically identified Allred (Latino), Hamer (Caucasian), Sharon Henn (Caucasian), Kathy Hass (Caucasian), Cyndy Johnson (Caucasian), Delanda Buchanan (African American), Gary McGlinn (Caucasian), and Ruby ("Tommy") Ullrich (Caucasian).

of events the court accepts for purposes of this motion. Moreover, to the extent there is some difference in degree between Solano's misconduct and that of the other employees, the difference in punishment was far greater: other employees appear to have suffered no discipline at all, while Solano initially faced termination and ultimately received a two-step demotion. According to Potratz, when she receives a travel voucher which is incorrect, she normally returns it to the employee for clarification or correction, but the employee is not disciplined. In this case, Solano's incorrect travel voucher led to investigation and a recommendation of termination. Potratz admitted that no other employee has faced equivalent discipline. (Potratz Dep. at 13:8-19; 46:12-48:12.) Thus, plaintiff has established a prima facie case of racial discrimination.

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to furnish a legitimate nondiscriminatory justification for the allegedly discriminatory conduct. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Here, defendant contends that Solano's demotion was based on her submission of a travel voucher requesting reimbursement for non-reimbursable expenses for the MIT Summit, her use of the corporate credit card for personal expenses on several occasions (for which she did not request the University pay) and misstatements during the investigation.

Once the defendant provides a nondiscriminatory justification for the treatment, plaintiff must demonstrate that defendant's justification was a pretext for discrimination. Here, Solano has submitted evidence establishing a genuine issue

10

of material fact on the issue of pretext. Initially, the trier of fact could infer pretext from the severity and disproportionality of the discipline initially recommended by Allred (Solano's dismissal after eighteen years of unblemished service to the University). Moreover, Solano testified that Allred requested that she cease participation the Hispanic Staff Association at the University, which provides some support for her argument that Allred's alleged animus toward her was racially motivated. While Allred denies he requested Solano stop participation in this group, resolution of factual disputes is the province of the jury.

**II. Gender Discrimination Claim Under Title VII and FEHA**

Generally, under Title VII, a plaintiff must exhaust his or her Equal Employment Opportunity Commission ("EEOC") administrative remedies prior to filing a complaint in federal court. Sosa v. Hiraoka, 920 F.2d 1451, 1456 (9th Cir. 1990). "Incidents of discrimination not included in an EEOC charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge." Green v. L.A. County Superintendent of Sch., 883 F.2d 1472, 1475-76 (9th Cir. 1989)(citations omitted). Plaintiff acknowledges that "she did not exhaust her administrative remedies on the gender discrimination claim." (Pl.'s Mem. Opp'n Summ. J. ("Pl.'s Mem.") at 1.) Therefore, defendant's motion for summary adjudication is granted as to plaintiff's gender discrimination claim under Title VII and FEHA.

**III. FEHA Claim for Failure to Prevent Discrimination**

Under the California FEHA, it is an unlawful employment

11

practice for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment." Cal. Gov't Code § 12940(k). A prerequisite to applicability of this section is that some form of discrimination or harassment in violation of FEHA actually occur. Trujillo v. N. County Transit Dist., 63 Cal. App. 4th 280, 289 (1998)(discussing the applicability of section 12940(I) prior to its re-designation as section 12940(k)). Defendant does not attack plaintiff's claim for failure to prevent discrimination on its merits, instead defendant maintains that plaintiff cannot support the claim without first establishing a violation of FEHA. Because plaintiff's claim for race discrimination survives summary judgment, as discussed above, she has satisfied the foundational requirement for application of the section. Thus, plaintiff has established a triable issue on her claim for failure to prevent discrimination under FEHA.

**IV. Claim for Retaliation in Violation of Title VII and FEHA**

To create a prima facie case of discriminatory retaliation, plaintiff must establish that (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action by her employer; and (3) a causal link exists between the adverse action and the protected activity. Trent v. Valley Electric Association Inc., 41 F.3d 524, 526 (9th Cir. 1994). There are two ways that an employer can violate the anti-retaliation provisions of Title VII. The adverse employment action may occur "because of the employee's opposition to conduct made an unlawful employment practice" by Title VII or "in retaliation for the employee's participation in the machinery set up by Title VII to

12

enforce its provisions." Hashimoto v. Dalton, 118 F.3d 671, 680 (9th Cir. 1997). Plaintiff bases her retaliation claim on her "opposition to discriminatory practices." (Compl. ¶ 9.) Specifically, she alleges that she suffered an adverse employment action (her demotion) due to her participation in the Hispanic Staff Association.[7]

Plaintiff's claim does not fall within the classic mold of protected "opposition to an unlawful employment practice." See Equal Employment Opportunity Commission v. Crown Zellerbach Corp., 720 F.2d 1008, 1012 (1983). She does not identify any discriminatory conduct by the University which she opposed; she merely asserts she was part of a "Hispanic advocacy group." See Id. at 1013 (employee's act "cannot be 'opposed to an unlawful employment practice' unless it refers to *some* practice by the employer that is allegedly unlawful."). However, she provides no evidence that the HSA opposed discriminatory conduct by the University such that her participation with the HSA would constitute a protected activity. Consequently, plaintiff has failed to establish a prima facie case of retaliation.

**V. Wrongful Demotion in Violation of Public Policy**

Defendant offers three independent grounds why summary adjudication is proper regarding plaintiff's common law claim for wrongful demotion in violation of public policy. However, the court does not reach the merits of the claim because the

---

[7] Plaintiff asserts that her retaliation claim also is based on her participation in the Staff Affirmative Action and Diversity Advisory Committee ("SAADAC"). However, in her deposition, Solano clearly states that she voluntarily ceased all participation in the SAADAC prior to the events at issue here. (RUF ¶ 48; Solano Depo. at 267:2-7.)

University is immune from tort liability pursuant to California Government Code section 815(a).

The University is a public entity as defined by the California Torts Claims Act. Cal. Gov't Code § 811.2. "Except as otherwise provided by statute: (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Cal. Gov't Code § 815. Thus, it is well established that "in California 'all government tort liability must be based on statute.'" Hoff v. Vacaville Unified School District, 19 Cal. 4th 925, 932 (1998)(citing Lopez v. Southern Cal. Rapid Transit Dist., 40 Cal. 3d 780, 785 (1985)). California courts have established that a common law claim for wrongful discharge in violation of public policy is a nonstatutory tort claim.[8] See Palmer v. Regents of the University of California, Cal. App. 4th 899, 909 (2003) (explaining that "[b]ecause the 'classic Tameny cause of action' is a common law, judicially created tort and not authorized by statute, it is not properly asserted against the

---

[8] Although defendant construed plaintiff's common law cause of action to be a claim for wrongful demotion in violation of public policy, plaintiff broadly alleges in her complaint that defendant violated "California common law." (Compl. ¶ 14.) Further, plaintiff did not clarify the basis of her claim in response to defendant's motion for summary judgment, but referred to it as a "common law claim . . . based on a violation of public policy set forth in FEHA." (Pl.'s Mem. at 8.) The fact that the claim could encompass more than one common law claim in violation of public policy is immaterial because all are a species of a "Tameny claim," which the California Supreme Court held to be a common law tort cause of action. Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167, 176 (1980); see also Williams v. Housing Authority of the City of Los Angeles, 121 Cal. App. 4th 708, 713 n.2 (2004)(stating that public policy violations premised on wrongful termination, wrongful constructive termination, and wrongful demotion are all common law tort causes of action).

14

Regents.") (citations omitted); see also Dao v. University of California, No. C-04-2257, 2004 WL 1824129, at *9 (N.D. Cal. Aug. 13, 2004)(relying on Palmer to hold that section 815(a) barred plaintiff's claim for wrongful discharge in violation of public policy); Bragg v. East Bay Regional Park District, No. C-02-3585, 2003 WL 23119278, at *6-*7 (N.D. Cal. Dec. 29, 2003)(granting motion for summary judgment of plaintiff's claim for wrongful termination in violation of public policy based upon section 815(a) governmental immunity and Palmer decision). Plaintiff has not proposed a statutory basis to avoid immunity on this claim.[9] Accordingly, defendant's motion for summary adjudication is granted as to plaintiff's claim for wrongful demotion in violation of public policy.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED as to plaintiff's claims for gender discrimination and retaliation in violation of Title VII and FEHA, and common law claim for wrongful demotion in violation of public policy. Defendant's motion is DENIED as to plaintiff's claims for racial discrimination in violation of Title VII and FEHA; and failure to prevent discrimination in violation of FEHA.

IT IS SO ORDERED.

DATED: August 15, 2005

>                    /s/ Frank C. Damrell Jr.
>                    FRANK C. DAMRELL, Jr.
>                    UNITED STATES DISTRICT JUDGE

---

[9] Plaintiff chose not to address the immunity issue in her response to defendant's motion.